Filed 1/11/24  In re S.R. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| In re S.R., a Person Coming Under the Juvenile Court Law. | 2d Juv. Crim. No. B327505 (Super. Ct. No. 20JV00074) (Santa Barbara County) |
| THE PEOPLE, Plaintiff and Respondent, v. S.R., Defendant and Appellant. | |

The People filed a juvenile wardship petition (Welf. & Inst. Code,[1] § 602, subd. (a)) alleging that S.R. committed murder (Pen. Code, § 187, subd. (a); count 1), dissuaded a witness by force or threat (*id.*, § 136.1, subd. (c)(1); count 2), and committed an assault with a semiautomatic firearm (*id.*, § 245, subd. (b);

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

count 3).  All counts alleged that the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang.  (*Id.*, § 186.22, subd. (b)(1).)  Counts 1 and 2 alleged that a principal intentionally discharged a firearm that proximately caused the victim's death.  (*Id.*, § 12022.53, subds. (b)-(e)(1).)  Count 3 alleged that S.R. personally inflicted great bodily injury on the victim (*id.*, § 12022.7, subd. (a)) and personally used a firearm (*id.*, § 12022.5, subd. (d)).

The People moved to transfer S.R. from juvenile court to a court of criminal jurisdiction pursuant to section 707.  The juvenile court granted the motion.  We affirm.

FACTS

*Underlying offense*

In August 2021, A.D.V., made a social media post in remembrance of a slain cousin.  It was suspected that a member of the West Side VLP gang (VLP gang) murdered A.D.V.'s cousin, who was a member of the rival F Street gang.  A.D.V. was cooperating with the police in the investigation of the murder of his cousin and was considered a "snitch" by VLP gang members.  Two VLP gang members threatened to kill A.D.V. and were later arrested.

S.R. is a member of the VLP gang.  In October 2021, A.D.V. was standing in front of his apartment.  S.R. and another VLP gang member, J.B., walked by.  S.R. and J.B. traded insults with A.D.V.  Initially S.R. and J.B. walked away.  A.D.V.'s sister-in-law filmed them.  S.R. picked up a rock and threw it at her.  A.D.V. walked toward S.R. and J.B.  An argument led to a physical altercation.  As A.D.V. tried to return to his apartment, S.R. and J.B. shot a total of nine shots at him.  Four of the shots hit A.D.V. in the back.  Both of A.D.V.'s children were outside

2

and witnessed the shooting.  One of the shots grazed A.D.V.'s sister-in-law as she picked up A.D.V.'s youngest child.  A.D.V. subsequently died of his wounds.  S.R. was 16 years old at the time.

### S.R.'s Background

Both of S.R.'s birth parents were addicted to drugs and had criminal histories.  S.R. and his siblings suffered from instability, neglect, and abuse.  S.R. was in foster care before being placed with his aunt, Laura F.  Laura F. adopted S.R. when he was nine years old.

Due to his childhood trauma, S.R. suffers from Attention Deficit/Hyperactive Disorder (ADHD) and Post-Traumatic Stress Disorder (PTSD).  He has an unstable personal identity, is highly susceptible to peer influence, and is prone to impulsivity and lack of emotional control.  S.R.'s intellectual functioning is at the 37th percentile.

Laura F. provided S.R. with a stable and loving home for six to seven years until he was detained for the current offenses.  Laura F.'s partner mentored S.R.  Laura F. tried to keep S.R. out of gang involvement and from making poor choices in friends.  She also sought counseling and other appropriate interventions.

When S.R. was 14 years old, he was mentored by John Hurst who worked for the Community Action Commission in Lompoc.  Under Hurst's guidance, S.R. completed reasoning and rehabilitation programs.  S.R. did well in the programs and formed a strong relationship with Hurst.  Nevertheless, in spite of the programs and Hurst's guidance, S.R. became involved with the VLP gang.

As a member of the VLP gang, S.R. earned the moniker "Looney."  Law enforcement suspected he had been involved in

3

another gang shooting that occurred prior to the underlying offense.  In October 2020, law enforcement found him in possession of a loaded shotgun and handgun while in the company of a VLP gang associate.

<u>*Performance in Juvenile Hall*</u>

S.R. entered juvenile hall in November 2021.  From that date through February 2022, S.R. received numerous disciplinary write-ups called Worker's Special Reports (WSR's).  The WSR's were for failure to follow staff orders and for showing disrespect to staff.  In early February 2022, S.R. received a WSR for writing lyrics celebrating the murder of A.D.V.

By March 2022, however, S.R.'s behavior had improved enough to be placed in the "Trust Unit," which has a family-like environment.  In November 2022, S.R. was moved out of the Trust Unit for fighting.  He was involved in two other fights in November 2022.  The fights had "gang undertone[s]."

On the positive side, S.R. earned his high school diploma with good grades, obtained a safe food handler certification, and enrolled in community college level courses.  He earned his way back into the Trust Unit in February 2023.

During the 14 months S.R. was in juvenile hall, he participated in four programs, met bi-weekly with a psychiatrist, and took his medications.  S.R. also requested placement in the ARISE gang intervention program.  The ARISE program has not been shown by research data to be effective.

<u>*Expert Opinion*</u>

Ruben Robles is a forensic social worker.  Robles testified that S.R. would benefit from the probation department's "incentive based cognitive behavioral therapy."  The program offers role models and practical life skills.  Robles believes that

S.R. had an identity crisis and needed "prosocial people and model behaviors." Robles believes that S.R is amenable to services and that the probation department has the resources to support him while under the jurisdiction of the juvenile court. Without such services S.R. could reoffend after jurisdiction expires.

Doctor Teo Ernst is a licensed psychologist. He testified that S.R. has an unstable personal identity, is highly vulnerable to peer influence, and prone to impulsivity and lapses in emotional control. Ernst testified, "[S.R.'s] current violence risk, if he were released in the community today, it's my opinion that it's moderate to high relative to other juvenile offenders." Ernst believed that with treatment aimed at violence reduction and brain maturity, S.R.'s risk for violence would likely be reduced in the future. Ernst testified, however, that S.R. had some characteristics that were mildly correlated with reoffending. Ernst reported that S.R. is unable to consider cutting off relations with his peer group. Ernst concluded that there is a reasonable probability S.R. will not reoffend if he is provided services until age 25, but he could not say definitely that S.R. would not reoffend.

## *Ruling*

In determining whether S.R. is amenable to rehabilitation while under the jurisdiction of the juvenile court, the court considered the factors listed in section 707, subdivision (a)(3)(A)-(E).

### *A. Degree of Criminal Sophistication*

In assessing the degree of criminal sophistication exhibited by S.R., the juvenile court acknowledged that S.R. had a terrible early childhood until he was adopted by Laura F. and suffers

5

from ADHD and PTSD. The court also acknowledged that S.R. suffers from a low general IQ. Laura F., however, provided him with a loving and stable home. She provided for all his needs, including counseling and other interventions to keep him away from gangs. Laura F.'s partner also tried to help S.R. Finally Hurst intervened. None of it worked. In spite of all the intervention, S.R. drew closer to his gang.

The juvenile court stated in part:

"[S.R.'s] behavior prior to the instant offense demonstrated an increasing involvement with the VLP gang, eventually earning him the moniker 'Looney.' He had frequent encounters with law enforcement, some involving firearms, that demonstrate an increasing criminal sophistication, such as avoiding law enforcement, allegedly disposing of weapons before being stopped and, in one instance, asking officers to not search him as he just got off probation and did not want to suffer further consequences.

"[S.R.] and his associate deliberately confronted the victim, in broad daylight and in the presence of others, to intimidate and came prepared with loaded firearms. It is also clear [S.R.] had little regard for his conduct, composing lyrics seemingly celebrating the murder after the fact. After the murder, [S.R.] fled, and hid for nearly a month, and deleted his social media posts. These acts demonstrate criminal sophistication and clear criminal intent."

The juvenile court found that in committing the underlying offenses, S.R.'s acts are consistent with his gang affiliation and were deliberate and thought out. The court further found that S.R.'s ADHD and PTSD did not play a major role in his decision to engage in the offenses.

The juvenile court concluded that the prosecution had carried its burden, and this factor weighs in favor of transfer to adult court.

B. *Rehabilitation Before Expiration of Juvenile Jurisdiction*

In assessing whether S.R. can be rehabilitated prior to the expiration of the juvenile court's jurisdiction, the court stated in part: "The evidence as to this factor is that [S.R.] has completely availed himself of rehabilitative services available in juvenile hall, showing a willingness to rehabilitate. However, [S.R.] has had difficulty maintaining his progress, regressing at times, and being disciplined, e.g., removal from the trust unit for fights, etc. Despite the programming in the hall, receiving therapy and ADHD medication, [S.R.] has received numerous WSRs. He has only recently returned to the trust unit. As testified to by [Leslie Stamm, a probation officer], [S.R.] has essentially undergone all programming available to [j]uvenile [p]robation at this time, except for the ARISE program, which is not an evidence-based program. And as indicated by Dr. Ernst, he remains a moderate to high risk of continued violence. Dr. Ernst and Mr. Robles could not, understandably, predict when [S.R.] could be rehabilitated. Indeed, previously, [S.R.] had successfully completed programming with Mr. Hurst, completing Joven Noble and other programs. Nonetheless, he again regressed, turning to a gang lifestyle, and incurring numerous gang related contacts with law enforcement. Clearly, [S.R.] enmeshed himself in gang culture."

The juvenile court concluded the prosecution has carried its burden, and this factor weighs in favor of transfer to adult court.

7

*C. Previous Delinquent History*

In assessing S.R.'s previous delinquent history, the juvenile court stated: "The court has previously summarized [S.R.'s] previous delinquent history. While [S.R.] did not have any juvenile adjudications before this offense, [S.R.'s] contacts with law enforcement increased dramatically before this offense, and most, if not all, were gang related, including a pending referral for a [Penal Code section] 148 offense, and an incident where he was found in possession of a loaded shotgun and handgun while with another gang member. As previously discussed, [S.R.'s] behavior prior to this offense escalated and became more sophisticated and serious, including suspected involvement in a gang related shooting incident."

The juvenile court concluded the prosecution had carried its burden and this factor favors transfer to adult court.

*D. Previous Attempts by the Juvenile Court*

In assessing previous attempts by the juvenile court to rehabilitate S.R., the juvenile court found only minimal evidence of such attempts. The court concluded this element is neutral.

*E. Circumstances and Gravity of Alleged Offense*

In assessing the circumstances and gravity of the alleged offense, the juvenile court incorporated its discussion under factor A, the degree of criminal sophistication. The juvenile court concluded the prosecution has carried its burden and this factor weighs in favor of transfer to adult court.

The juvenile court's ultimate conclusion, derived from all the factors listed in section 707, subdivision (a)(3)(A)-(E), is that the prosecution carried its burden to show by clear and convincing evidence that S.R. is not amenable to rehabilitation

while under the jurisdiction of the juvenile court. The juvenile court ordered the matter transferred to adult criminal court.

DISCUSSION

I.

*Statutory Background*

Section 707, subdivision (a)(1), provides, in part: "In any case in which a minor is alleged to be a person described in Section 602 by reason of the violation, when the minor was 16 years of age or older, of any offense listed in subdivision (b) or any other felony criminal statute, the district attorney or other appropriate prosecuting officer may make a motion to transfer the minor from juvenile court to a court of criminal jurisdiction."

Section 707, subdivision (a)(3), provides, in part: "In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court. In making its decision, the court shall consider the criteria specified in subparagraphs (A) to (E), inclusive."

Section 707, subdivision (a)(3), subparagraphs (A) through (E) provide, in part:

"(A) [¶] (i) The degree of criminal sophistication exhibited by the minor.

"(B) [¶] (i) Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction.

"(C) [¶] (i) The minor's previous delinquent history.

"(D) [¶] (i) Success of previous attempts by the juvenile court to rehabilitate the minor.

"(E) [¶] (i) The circumstances and gravity of the offense alleged in the petition to have been committed by the minor."

9

## II.

### *Sufficient Evidence*

S.R. contends that the juvenile court's conclusion that he is not amenable to rehabilitation before the expiration of jurisdiction is not supported by sufficient evidence.

Where, as here, a finding requires clear and convincing evidence, we must determine whether the record contains substantial evidence from which a reasonable trier of fact could have found it highly probable that the fact was true. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.) In conducting our review, we must view the record in a light most favorable to the prevailing party and give appropriate deference to how the trier of fact may have evaluated the credibility of witness, resolved conflicts in the evidence, and drawn reasonable inference from the evidence. (*Id.* at pp. 1011-1012.)

### *Accurate View of the Evidence*

S.R. argues that the juvenile court's conclusion is based on inaccurate descriptions of the evidence.

The juvenile court stated that "[S.R.] remains at a moderate to high risk of continued violence" as testified by Ernst. Ernst previously testified: "[S.R.'s] current violence risk, if he were released in the community today, it's my opinion that it's moderate to high relative to other juvenile offenders." The court's interpretation of Ernst's testimony is accurate.

S.R. points out Ernst testified that treatment along with maturation will more likely than not "reduce" S.R.'s current violent risk by or before age 25. Even assuming by "reduce" Ernst meant reduce to an acceptable level, the juvenile court was not bound to accept that conclusion.

10

The juvenile court considered S.R.'s traumatic early childhood. But it also considered that from at least age nine, Laura F., her partner, and Hurst had intervened to persuade S.R. away from gangs and toward making better choices in friends. The interventions included role modeling, counseling, and programs. The result of all that effort was S.R.'s choice to remain in his gang and commit murder. Far from being remorseful, S.R. wrote lyrics glorifying the murder.

In S.R.'s 14 months in juvenile hall, he participated in almost every program that probation had to offer. Yet his behavior escalated from showing disrespect to staff to engaging in gang-related physical violence. In spite of eight years of interventions, both outside and inside juvenile hall, S.R. remains at moderate to high risk for violence. Perhaps most telling of all, Ernst reported that S.R. is unable to consider cutting off relations with his peer group, that is, his gang. If S.R. is released at 25 years old, the evidence shows he will embrace his gang. His gang will in turn embrace him as a hero, and further violence from S.R. will be inevitable. The evidence before the juvenile court fully supports the court's conclusion that it is highly probable S.R. will not be amenable to rehabilitation before the expiration of the court's jurisdiction.

S.R. argues that the second error in the juvenile court's inaccurate description of the evidence is the statement: "As testified to by Ms. Stamm, the minor has essentially undergone all programming available . . . except for the ARISE program . . . ." S.R. argues that in fact he had not undergone the Seeking Safety program. But S.R. admits that program was not available at the time of the transfer hearing. The court's statement is accurate.

11

S.R. argues that the time available for rehabilitation seems to be underestimated. But the juvenile court recognized that S.R. committed the crime when he was 16 years old, he was 17 years old at the time of the transfer hearing, and he has until he is 25 years old to be rehabilitated. The court did not underestimate the time available for rehabilitation.

S.R. contends that the juvenile court improperly relied on the lack of an evidence-based program.

The juvenile court stated that S.R. participated in essentially all of the programs except for the ARISE program which is not evidence-based. S.R. claims that ARISE is a gang intervention program, and that there are no evidence-based gang intervention programs. S.R. concludes that transferring minors to adult court because there is no evidence-based gang intervention program effectively precludes juvenile court jurisdiction for a specified class of juvenile offenders.

But the juvenile court did not order S.R. transferred because of the lack of an evidence-based gang intervention program. It ordered S.R. transferred because in spite of years of interventions he remains violent and attached to his gang, and it is highly probable that will not change by the time he attains 25 years of age.

S.R. argues that his previous failures to rehabilitate do not show that additional programming would be ineffective. S.R. suggests ARISE, which has not been shown to be effective, and Seeking Safety, a program not available at the time of the transfer hearing. But S.R. has already taken all the other programs that probation has to offer. The juvenile court could reasonably conclude an extra program or two is not going to turn the tide.

Moreover, the juvenile court can only predict S.R.'s future by considering his past performance and his resolve to reform. As to S.R.'s past performance, his risk of violence remains moderate to high. As to his resolve to reform, he cannot even consider leaving his gang.

## III.

### *Juvenile Court's Understanding of Law*

S.R. contends that the transfer order must be reversed because the juvenile court relied on an erroneous understanding of the applicable law.

Effective January 1, 2023, section 707, subdivision (a)(3), was amended to prevent transfer unless the court found by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court. (Stats. 2022, ch. 330, § 1.) The amendment changed the statute in three ways. First, it changed the burden of proof from a preponderance of the evidence to clear and convincing evidence. Second, it raised whether the minor is amenable to rehabilitation while under the jurisdiction of the juvenile court from one of five factors to the ultimate question. Third, it requires the court to state the reasons for its finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court. (*In re E.P.* (2023) 89 Cal.App.5th 409, 415-416.)

Here the record shows the juvenile court well understood the applicable law. The court considered the five factors required by section 707, subdivision (a)(3)(A)-(E). It found four of the factors favored transfer and one was neutral. The court's statement of decision shows the court well understood that the ultimate question was whether S.R. can be rehabilitated before the juvenile court loses jurisdiction. The court properly weighed

the five factors and found the prosecution proved its case for transfer by clear and convincing evidence.  The court clearly stated its reasons for the finding.

DISPOSITION

The judgment (order) is affirmed.

NOT TO BE PUBLISHED.


GILBERT, P. J.


We concur:


YEGAN, J.


BALTODANO, J.

Gustavo E. Lavayen, Judge

Superior Court County of Santa Barbara

_____

Esther R. Sorkin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.